# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF KENTUCKY
# CENTRAL DIVISION
# LEXINGTON

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | No. 5:18-CR-00081-REW-MAS-9 |
| **v.** ) | |
| ) | |
| **CRISTISOR OLTEANU,** ) | |
| ) | |
| **Defendant.** ) | |

## DETENTION OPINION

Defendant Cristisor Olteanu[1] is charged with two counts each of conspiring to commit mail fraud, to launder money, and participating in a RICO scheme in this twenty-defendant Superseding Indictment. [DE 249]. The United States orally sought detention per 18 U.S.C. § 3142(f)(2)(A). [DE 1635]. Olteanu contested that the United States had met its burden to move for detention. [DE 1635]. The Court held a hearing on that issue and finding that the United States could make the motion, considered the ultimate issue of detention. The Court finds Olteanu is an irremediable flight risk and must be detained pending trial.

## I.  LEGAL STANDARD

The Government moved for detention under § 3142(f)(2)(A), urging that Olteanu posed a "serious risk of flight." 18 U.S.C. § 3142(f)(2)(A). The Bail Reform Act (BRA) requires the Court to conduct a two-step inquiry in this circumstance. *See*,

---

[1] Defendant states his true name is Cristisor Bujor. For clarity in the record, the Court refers to him by the name listed in the Superseding Indictment.

*e.g.*, *United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988); *United States v. Ailon-Ailon*, 875 F.3d 1334 (10th Cir. 2017). First, the Court must determine whether a detention hearing is permissible under § 3142(f). "Congress did not intend to authorize preventative detention unless the judicial officer first finds that one of the section 3142(f) conditions for holding a detention hearing exists." *United States v. Ploof*, 851 F.2d 7, 11 (1st Cir. 1988). *See also United States v. Hardon*, No. 98-1625, 1998 WL 320945, at *1 (6th Cir. June 4, 1998); *United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988); *United States v. Byrd*, 969 F.2d 106 (5th Cir. 1992). If the Court finds that one of the § 3142(f) conditions for detention is met, the Court moves to the second step of the analysis and conducts a detention hearing. *See Ploof*, 851 F.2d at 9-10 (The BRA "does not authorize a detention hearing whenever the government thinks detention would be desirable, but rather limits such hearings to the [circumstances listed in (f)(1) and (f)(2)]." Where the United States moves for detention under § 3142(f)(2)(A), it must show by a preponderance of the evidence that the case involves "a serious risk [the defendant] will flee[.]" 18 U.S.C. § 3142(f)(2)(A); *United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988); s*ee also United States v. White*, No. 3:21-MJ-04070, 2021 WL 2155441, at *7 (M.D. Tenn. May 27, 2021).

Clearing the first hurdle, a finding of detention premised on nonappearance also requires preponderant evidence. *See, e.g.*, *United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir. 1991); *United States v. Curry*, No. 6:06-CR-82-DCR, 2006 WL

2

2037406, at *6 (E.D. Ky. Jul. 18, 2006).[2] Importantly, and as this Court discussed in *United States v. Cobix-Espinoza*, the "risk of flight" under subsection (f)(2)(A) is different from the "risk of nonappearance" that subsection (e) directs the Court to assess at a detention hearing. *United States v. Cobix-Espinoza*, 655 F.Supp.3d 584, 587 (E.D. Ky., 2023); "'[I]t is clear that flight and nonappearance are not simply interchangeable names for the same concept, nor are they merely different degrees of the same type of risk.  In the context of measuring and managing risks, many defendants who merely fail to appear differ in important ways from their fugitive cousins.  Precision about these distinctions is constitutionally mandated and statutorily required.'" *United States v. White*, 2021 WL 2155441, at *10 (M.D. Tenn. May 27, 2021) (quoting Lauryn P. Gouldin, *Defining Flight Risk*, 85 U. Chi. L. Rev. 677 (2018)).  "Risk of flight" is a specific subcategory of "nonappearance," characterized by fleeing the jurisdiction (typically to evade prosecution), not merely failing to appear at a Court appearance.  Evidence that the defendant poses a general risk of failing to appear for Court may be sufficient to justify pretrial detention pursuant to subsection (e)(1), however, that same evidence is insufficient to show that the United States is entitled to a detention hearing in the first place under subsection (f)(2)(A).

---

[2] Danger-based detention, however, demands clear and convincing evidence that no combination of conditions will reasonably ensure community safety. 18 U.S.C. § 3142(f). The analyses are distinct. Conditions that sufficiently target nonappearance risk may not adequately address danger potential. *See United States v. Mercedes*, 254 F.3d 433, 436-37 (2nd Cir. 2001).

3

Even if the United States can succeed on both steps described above, the Court must find that there are no conditions or combination of conditions that will adequately mitigate the risk the defendant will not appear. Condition effectiveness inherently hinges on a defendant's predicted good faith compliance. *See United States v. Tortora*, 922 F.2d 880, 887 (1st Cir. 1990) (characterizing predicted compliance as critical release component); *United States v. Hir*, 517 F.3d 1081, 1092 (9th Cir. 2008) (noting the "critical flaw" in a set of proposed release conditions: "In order to be effective, they depend on [the defendant's] good faith compliance."); *id.* at 1093 n.13 (observing that, barring a "replica detention facilit[y]," the success of any condition combination necessarily "hinge[s] on [the defendant's] good faith compliance").

Evidence rules do not apply in the detention hearing context. 18 U.S.C. § 3142(f). The key is simply evidentiary reliability and accuracy. *See, e.g., United States v. Webb*, 149 F.3d 1185 (Table), No. 98-1291, 1998 WL 381686, at *1 (6th Cir. June 22, 1998). The Court properly considers a wide range of proof. The nature and quality of proof, though, impacts its probative value and weight in the detention calculus. The § 3142(g) factors drive the analysis.

## II.   FACTUAL BACKGROUND

### A.   THE ALLEGED CRIME

Olteanu is charged with participating in a large-scale, international fraud scheme. The details of the scheme are well-known to the Court in this six-year-old case. The scheme involved defrauding American citizens by "posting false advertisements for goods online, often using stolen identities and trademarks from legitimate online auction companies . . . and laundering the [stolen] money through

4

channels in the United States and ultimately Eastern Europe." [Superseding Indictment, DE 249 at Page ID# 2404]. The conspirators used websites such as eBay to post fake listings for large-dollar items like vehicles, then receive payment in the form of gift cards for the non-existent goods. They then used cryptocurrency to launder and obscure the ill-gotten funds. [DE 249].

B.  **OLTEANU'S BACKGROUND**

Olteanu is a 37-year-old Romanian national. [Pretrial Services Report at 1]. He lives with his mother and father in Romania. One of his siblings lives in Romania while the other three live in Germany. [Pretrial Services Report at 1]. Olteanu's ex-wife lives in London, England, with their four children. Olteanu considers himself a full-time Romanian resident; however, he lived in the United Kingdom off and on between 2011 and 2017. Additionally, he lived in Germany from 2019 through 2021. [Pretrial Services Report at 2].

While in the United Kingdom Olteanu worked as an Uber driver; in Germany he was a delivery driver and cleaned at a gym. He did not report any employment in Romania. [Pretrial Services Report at 2]. Olteanu has been convicted of two criminal violations in Romania for "Battery and Other Acts of Violence" and blackmail. He was on probation for these matters. [Pretrial Services Report at 2].

Olteanu was extradited to the United States for the purpose of this prosecution. When he was arrested, he was found with evidence of fraudulently utilizing other peoples' identities, according the United States's proffer. Olteanu's visa was issued for the sole purpose of appearing for prosecution. He does not have family, personal connections, employment, or a residence in the United States.

C. **DETENTION MOTION PURSUANT TO 18 U.S.C. § 3142(F)(2)(A)**

The United States argued that there is a serious risk Olteanu will flee the jurisdiction because his only connection to the Eastern District of Kentucky is this case. The United States claimed that Olteanu has connections in England, Germany, and Romania that could facilitate his flight from the United States, and that he has assets, particularly cryptocurrency, that he could access to flee. The United States pointed out that there is an Immigration and Customs Enforcement detainer in place for Olteanu as well.

Olteanu countered that he left Germany to appear on the warrant in this matter in Romania, and that he has voluntarily appeared for these charges.³ He further noted that although there is an immigration detainer in place, risk of deportation alone does not rise to the level of serious flight risk, because fleeing from prosecution requires volition. See *United States v. Ailon-Ailon,* 875 F.3d 1334, 1338 (10th Cir. 2017). Olteanu argued he does not have any financial resources with which to flee, despite the United States's assertion to the contrary. He stated that practically speaking, has no means by which to leave this district.

The Court finds the United States met the burden of preponderant evidence that Olteanu presents a serious flight risk per 18 U.S.C. § 3142(f)(2)(A). The Court has previously written about the burden the United States must meet in this instance. *United States v. Cobix-Espinoza*, 655 F. Supp. 3d 584 (E.D. Ky. 2023). The

---

³ The United States disagreed with this characterization, stating that Olteanu was arrested in Romania and did not voluntarily surrender, indicating that he was not voluntarily appearing for the instant charges.

6

Court is persuaded by the United States's argument that there is nothing except prosecution tying Olteanu to this district or the United States as a whole. He has contacts in multiple foreign countries that he could utilize to flee. And although Olteanu argued that he does not have any resources by which to abscond, the Court is further persuaded that the evidence of cryptocurrency activity on his phone, plus the allegations herein—that he moved money and cryptocurrency around the globe—that suggest he will be able to access funds for flight. For these reasons, the Court finds the United States met its initial burden of persuasion that Olteanu presents a serious risk of flight, and therefore, the United States is entitled to move for his pretrial detention.

### D. DETENTION DECISION PURSUANT TO 18 U.S.C. § 3142(E) AND (G)

The Court must now determine whether the United States has proved by a preponderance of the evidence that Olteanu presents a risk of nonappearance that no conditions or combination of conditions can sufficiently mitigate.[4] 18 U.S.C. § 3241(e). If no set of conditions can reasonably assure appearance and safety, the Court must order detention. *Id*. The Court considers the factors listed in § 3142(g) in making that determination.

---

[4] Although the Court could also consider the risk of danger Olteanu presents to another person or the community at this step in the analysis, the United States made no substantial argument that it sought detention based on danger or that Olteanu presents a danger to another person or the community. See *Cobix-Espinoza*, 655 F.Supp.3d at 589-90. The United States conceded that the focus of its detention argument was Olteanu's risk of nonappearance. Thus, the Court has focused its analysis solely on the risk of nonappearance.

7

The nature and circumstances of the alleged crime imply some risk of nonappearance. Olteanu is charged with being a major participant in a multi-national online fraud scheme. The Superseding Indictment alleges he engaged in a multi-year conspiracy to defraud American citizens through the Internet while he was in Europe. Olteanu is charged with engaging in cryptocurrency transactions that represented the proceeds of the fraud. The United States proffered that Olteanu profited significantly from his involvement in the conspiracy, and that these profits were in the form of cryptocurrency. Olteanu's alleged role in this conspiracy, the international nature of it, and his resulting access to large sums of cryptocurrency profits from the scheme require a finding that the nature and circumstances of this offense lean in favor of detention.

The second § 3142(g) factor measures the "weight of the evidence against the person" and is "concerned with a practical assessment of the defendant's dangerousness, rather than an adjudication of guilt for a particular offense." *United States v. Tolbert*, 2017 WL 6003075, at *5 (E.D. Tenn. Dec. 4, 2017) (citing *Stone*, 608 F.3d at 948). To the extent that this factor weighs the evidence of nonappearance, the second factor typically merges with the third factor in the nonappearance analysis. Section 3142(g)(3) requires courts to consider "the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings" and whether, at the time of the current offense the person was on

8

probation or pretrial release. 18 U.S.C. § 3142(g)(3). As discussed, Olteanu has no ties to the Eastern District of Kentucky, or the United States generally, other than this prosecution.

Olteanu reports earning $2,000 per month presently but did not explain where that income comes from. [Pretrial Services Report at 2]. He does not have any physical or mental health issues, nor does he have a history of substance use. [Pretrial Services Report at 2]. His bond report reflects frequent moves between European countries over the last decade. [Pretrial Services Report at 2]. Although these moves are explained in part because his children live in the United Kingdom, the Court has concerns that Olteanu did not demonstrate that he had a consistent residence and employment even in his home country, much less one where he has no ties.

At the hearing, Olteanu could not provide the Court with a plan for where he would live or work if the Court released him. Because he was brought to this district by law enforcement, Olteanu would be homeless if released. He suggested he would stay in a homeless shelter until he could make other arrangements. The Court makes two observations: First, this Court has previously held that homelessness is not "a crime, and the Court will not treat [it] as such simply because it makes crafting release conditions and supervising a defendant more difficult." *United States v. Maez*, 5:22-cr-00030-GFVT, DE 27 at Page ID# 66. Second, although the burden remains firmly with the United States, and Olteanu does not have to prove his residence or employment to qualify for release, this admission by Olteanu provided another

9

argument in favor of detention by the United States. The United States argued that with a history of engaging in criminal deception and using false identities coupled with no residence, no job, and no friendly ties to this district, and no realistic plan to obtain any of the three, the second and third factors in § 3142(g) point towards nonappearance-based detention.

Finally, the Court must consider "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(4). Here, the primary danger is that Olteanu will abscond to a foreign country and evade prosecution altogether. He would then be free to continue to commit similar crimes as charged here, victimizing Americans. The United States proffered that he possessed other peoples' identities on his phone when he was arrested, and that there is information he has recently been opening accounts in other peoples' names. The United States stated it had evidence he has continued to engage in fraudulent activity since he became aware of the Indictment in this case. While the Court is not undertaking a full danger analysis in this matter, the Court notes that the risk that Olteanu would flee the country is high, and such flight poses both the risk that he will never have to answer for any crimes he may have committed against American citizens, as well as provides the opportunity for him to participate in new criminal conduct.

Weighing these four § 3142(g) factors, the Court finds the United States has proved by a preponderance of the evidence that Olteanu poses a risk of nonappearance that no conditions or combination conditions will address. Because

Olteanu lacks a home, a job, or a responsible custodian in this country, fashioning conditions for him to be supervised is nearly impossible. Even if the Court could craft such conditions, the Court has little belief that Olteanu will abide by them, in light of his apparent continued criminal conduct since 2018, and the many possible motivations to flee back to his home country to avoid prosecution here.

### III.   CONCLUSION

For the reasons stated above, the Court holds the United States proved by a preponderance of the evidence that Olteanu was a serious risk of flight sufficiently to conduct a detention hearing, and that the United States also proved by a preponderance of the evidence that there are no conditions or combination of conditions that will adequately mitigate the risk that he fails to appear in this case. Accordingly, the Court GRANTS the United States' oral detention motion and orders Olteanu to be detained pending trial.

The defendant is remanded to the custody of the Attorney General or to the Attorney General's designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal. The defendant must be afforded a reasonable opportunity for private consultation with defense counsel. On order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility must deliver the defendant to a United States Marshal for the purpose of an appearance in connection with a court proceeding.

The parties may appeal this Order under the terms of 18 U.S.C. § 3145.

Entered this 18th day of November, 2024.

*Matthew A. Stinnett*
MATTHEW A. STINNETT
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF KENTUCKY